UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Gregory B. Monaco, *etc.*, *et ano.*,

                    Plaintiffs,              CV-98-3386
                                             (CPS)(RML)

        - against -                          MEMORANDUM
                                             OPINION AND
                                             ORDER

Michael F. Hogan,[1] *etc., et alia*,

                    Defendants.

----------------------------------------X

SIFTON, Senior Judge.

        Plaintiffs Gregory B. Monaco ("Monaco"), on behalf of

himself and similarly situated individuals, and the Mental

Disability Law Clinic, Touro Law Center (the "Clinic")[2]

(collectively "plaintiffs") bring this class action for

---

        [1]  Michael F. Hogan is now the Commissioner of New York's Office of
Mental Hygiene and should be substituted for Sharon Carpinello as the named
party, pursuant to Fed. R. Civ. Pro. 25(d).

        [2]   The Clinic is operated as part of the clinical program of the Jacob
D. Fuchsberg Law Center at Touro College.  It is designated as a protection
and advocacy agency by the PAMII Act, 42 U.S.C. § 10801 *et seq.* under which it
is authorized to investigate incidents of abuse and neglect of individuals
with mental illness and to provide legal representation to institutionalized
mentally ill individuals.  Congress enacted PAMII in 1986 "to ensure that the
rights of individuals with mental illness are protected" and "to assist States
to establish and operate a protection and advocacy system for individuals with
mental illness which will ... protect and advocate the rights of such
individuals through activities to ensure the enforcement of the Constitution
and Federal and State statutes...." 42 U.S.C. § 10801(a)(1), (b)(1), (2)(A).
        In New York State, the Commission on Quality of Care for the Mentally
Ill (the "Commission") receives funding under the PAMII Act to maintain a
statewide system of advocacy services for the mentally ill.  The Commission
has contracted with six organizations that serve as regional focal points.
Plaintiff Clinic serves as the regional office for Nassau and Suffolk
counties, but it has and exercises discretion to provide services to
individuals located elsewhere. *Monaco v. Stone*, 2002 WL 32984617, at *10-11
(E.D.N.Y. Dec. 18, 2002).

declaratory and injunctive relief against the following
defendants: Sharon Carpinello, in her official capacity as Acting
Commissioner of the New York State Office of Mental Health
("OMH");[3] Catherine Cahill, in her official capacity as Justice
of the East Hampton Town Justice Court, on behalf of herself and
all other local criminal court judges in New York State;[4]
Benjamin Chu, in his official capacity as the Director of the New
York City Health and Hospitals Corporation ("HHC"); Mark Sedler,
M.D., in his official capacity as Chairman of the Department of
Psychiatry at University Hospital of the State University at
Stony Brook; Kenneth Skodnek, in his official capacity as
Chairman of Psychiatry at Nassau University Medical Center;
Alfred Tisch, in his official capacity of Sheriff of Suffolk
County; and Martin Horn, in his official capacity of Commissioner
of the New York City Department of Corrections.[5]

Plaintiffs allege violations of the Fourth Amendment, the
Due Process and Equal Protection Clauses of the Fourteenth

---

[3] The parties use Carpinello's name throughout their papers. As
defendant Hogan has been substituted, *see* footnote 1, *supra*, I will refer to
this defendant as "Commissioner."

[4] The local criminal courts of New York State are comprised of the
district courts, the New York City criminal court, other city courts, the town
courts, and the village courts. N.Y.C.P.L. § 10.10.

[5] In a previous decision, *Monaco v. Stone*, 2002 WL 32984617 (E.D.N.Y.
Dec. 20, 2002), this Court dismissed the claims against Arnold Licht, in his
official capacity as Director of the psychiatric unit of Long Island College
Hospital, and granted summary judgment in favor of four doctors sued
personally. In their fifth amended complaint, plaintiffs re-asserted these
claims against these defendants in order to preserve their right to appeal
this Court's judgment. Plaintiffs and these defendants have all agreed to
dismissal of the reasserted claims by stipulation.

Amendment to the United States Constitution, and 42 U.S.C. § 1983, as well as state law claims for false imprisonment negligence, and medical malpractice. As amended, the complaint contains two major components: 1) a challenge to the constitutionality of the practices of Cahill, Horn, and Tisch, who are alleged to have unnecessarily prolonged the confinement of individuals found incompetent to stand trial for minor felonies and misdemeanors and those awaiting such a determination; 2) a challenge to the constitutionality of the procedures allegedly used by defendants Commissioner, Chu, Sedler, Skodnek, and Licht to hospitalize individuals deemed mentally ill involuntarily.[6]

---

[6] The Fifth Amended Complaint also alleges individual damages claims on behalf of plaintiff Monaco. These causes of action, set forth below for the sake of completeness, have either been dismissed, *see* footnote 4, *supra*, or are not at issue on the motions before the Court.

The Sixteenth Cause of Action alleges:

By discontinuing a treatment regimen of lithium in the Suffolk Correctional Facility when it was the unquestioned treatment of choice for the bipolar disorder that the plaintiff suffered from, defendant Packard provided medical treatment that was both deliberately indifferent to the plaintiff's medical needs and constituted a substantial departure from accepted judgment, practices and standards. As a result, defendant Packard violated the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

Fifth Amended Complaint (hereinafter "FAC") ¶ 220.

The Seventeenth Cause of Action alleges:

By authorizing the confinement of the plaintiff when he did not pose a danger to himself or others, defendants Sarwal, Palma-Acquino and Tuzel violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

FAC ¶ 222.

Now before this Court is defendant Commissioner's motion for summary judgment on plaintiffs' Seventh, Eighth, Ninth, and Eleventh Causes of Action and defendant Cahill's motion for abstention and dismissal of the First and Second Causes of Action or, in the alternative, an order decertifying the defendant class of local criminal court justices.  For the reasons set forth below, defendant Commissioner's motion and defendant Cahill's motion are granted.

## Background

I.  <u>Statutory Scheme At Issue</u>

A brief description of the statutory scheme at issue is necessary to understand plaintiffs' claims.

A.  <u>CPL § 730.40</u>

When a criminal court determines that a defendant lacks capacity to stand trial, N.Y. Crim. Pro. Law ("CPL") § 730.40(1)

---

The Eighteenth Cause of Action alleges:

By threatening to (1) confine the plaintiff indefinitely and (2) withhold the provision of off-ward treatment unless the plaintiff agreed to remain as a voluntary patient, defendant Dave impermissibly induced a waiver of the plaintiff's rights to challenge his confinement under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and further violated 42 U.S.C. § 1983.

FAC ¶ 224.

The Nineteenth Cause of Action alleges:

By discontinuing a treatment regimen of lithium in the Suffolk Correctional Facility when it was the unquestioned treatment of choice for the bipolar disorder that the plaintiff suffered from, defendant Packard committed medical malpractice.

FAC ¶ 226.

requires the court to "issue a final or temporary order of
observation, committing him to the custody of the [Commissioner
of Mental Health] for care and treatment . . . for a period not
to exceed ninety days from the date of the order." If the charge
is a misdemeanor, the order must be a "final order of
observation." If the accusatory instrument is a felony
complaint, the order must be a "temporary order of commitment"
unless the District Attorney consents to a final order. *Id*. A
final order of observation bars any further prosecution on the
charge in the accusatory instrument, as the court, upon its
issuance, is required to dismiss the charges against the
defendant. The issuance of an order of observation results in
the remand of the defendant to the custody of the OMH
Commissioner. *Id*.

In *Ritter v. Surles*, 144 Misc.2d 945 (Sup.Ct.West.Cty.
1988), the court found that aspects of CPL § 730.40 violated the
United States Constitution. To comport with *Ritter*, the OMH
instituted a policy that directed its facilities to confine
individuals remanded pursuant to § 730.40 for a period not to
exceed 72 hours, rather than the 90-day period provided in the
statute, *see Charles W. v. Maul*, 214 F.3d 350, 355-56 (2d Cir.
2000),[7] and to determine in this period whether civil commitment

---

[7] The *Charles W.* court found this 72-hour period did not run afoul of
due process concerns. 214 F.3d at 358-60.

was appropriate for the defendant. *Id*. If the criteria for civil commitment are not met, the defendant is to be released.

B. <u>Civil Commitment</u>

Article 9 of New York's Mental Hygiene Law sets out the state's civil commitment scheme. Under Article 9, a psychiatric hospital may involuntarily admit a patient upon the certificates of two physicians and a confirmation of the need for hospitalization by a third physician. *See* N.Y. Mental Hyg. Law ("MHL") § 9.27(a) & (e). In an emergency, a hospital may admit a patient upon the certificate of one doctor who has determined that the patient has a mental illness that requires immediate inpatient care and is likely to result in serious harm to himself or others.[8] *See id*. §§ 9.37(a); 9.39(a); 9.40(a). The need for immediate hospitalization must be confirmed by a staff physician prior to admission. *See id*. § 9.37(a).

Although not explicitly stated by MHL § 9.27, several court decisions have made clear that involuntary commitment under this

---

[8] For the purposes of Article 9 of the MHL, "likelihood to result in serious harm" means:

1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or

2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

MHL §§ 9.01 and 9.39(a)(1-2). The threatened harm to oneself can include harm resulting from a failure to meet one's essential needs for food, clothing, or shelter, or neglect or refusal to care for oneself. *In re Scopes*, 59 A.D.2d 203, 205-06 (3d Dep't 1977).

section requires a finding that the mentally ill individual poses
a threat of harm to himself or others.  *See O'Connor v.
Donaldson*, 422 U.S. 563, 572 (1975) (violation of due process to
confine a person solely because he or she is mentally ill);
*Project Release v. Prevost*, 722 F.2d 960, 973-74 (2d Cir. 1983)
(With dangerousness requirement, New York's statutory scheme
governing involuntary commitments facially sufficient to meet the
requirements of due process); *In re Harry M.*, 96 A.D.2d 201, 206-
08 (2d Dep't 1983); *In re Scopes*, 59 A.D.2d 203, 205-06 (3d Dep't
1977).

II.  Procedural Background

     On March 12, 1999, I certified Gregory Monaco as the
representative of a plaintiff class ("Original Plaintiff Class")
of all individuals who have been or will be (1) charged with a
minor felony or misdemeanor, (2) evaluated to determine whether
or not they are competent to stand trial; (3) found by court
appointed psychiatrists to lack the capacity to stand trial and
awaiting a determination of the competency issue by the local
criminal court.  *Monaco v. Stone*, 187 F.R.D. 50, 63 (E.D.N.Y.
1999) ("*Monaco I*").  I also certified a subclass ("Original
Plaintiff Subclass") of all individuals who have been or will be
(1) charged with a minor felony or misdemeanor, (2) evaluated to
determine whether or not they are competent to stand trial, (3)
found by court appointed psychiatrists to lack the capacity to

stand trial, and (4) confined to a local jail pending a
determination of competency by the local criminal court. *Id*. at
63-64. I further certified a defendant class, represented by
defendant Cahill, of all local criminal court judges who have the
authority pursuant to CPL § 730.40 to involuntarily commit
incompetent defendants. *Id*. at 64.

In 2002, plaintiffs sought to certify a new class and two
subclasses. The new class was to comprise of persons who
satisfied one or more of the following criteria: (1) they are or
will be confined to a jail pending a competency determination;
(2) they have been or will be found incompetent to stand trial
and remanded to an OMH facility pursuant to CPL § 730.40; and/or
(3) they are or will be subject to a civil commitment evaluation
pursuant to Article 9 of the MHL. I declined to certify this
class, as plaintiffs failed to satisfy the commonality
requirement. *Monaco v. Stone*, 2002 WL 32984617, at *37 (E.D.N.Y.
Dec. 18, 2002) ("*Monaco II*"). I did, however, certify what I and
the parties termed subclasses because Fed. R. Civ. Pro.
23(c)(4)(B) (2002) required subclasses be treated as classes for
the purposes of certification.

The first subclass, to be represented by Monaco and the
Clinic, comprises all individuals who have been or will be (1)
charged with a minor felony or misdemeanor, (2) evaluated to
determine whether or not they are competent to stand trial, (3)

found by court appointed psychiatrists to lack capacity to stand trial, who are awaiting a determination of the by the local criminal court, and (4) if remanded pursuant to CPL § 730.40, subject to a civil commitment evaluation pursuant to New York Criminal Procedure Law article 9 ("Incompetency Subclass"). *Monaco II*, at *37.  I further divided the Incompetency Subclass into two sub-subclasses.  *Id*. at 37-38.

I also certified a Civil Commitment Subclass, to be represented by the Clinic, which consists "of all individuals in the counties of Kings, Queens, Richmond, Nassau, and Suffolk[9] who are subject to civil commitment evaluations pursuant to Mental Hygiene Law article 9 at facilities operated by the Office of Mental Health or other state entities, local governments, and private entities."  *Id*. at *43.[10]  The subclass was subsequently modified to delete the reference to private entities.  *Monaco v. Stone*, Memorandum Opinion & Order, at *11 (E.D.N.Y. Nov. 17, 2003).[11]

---

[9]  Plaintiffs' counsel limited the subclass to these counties "because a larger class may overextend the resources of plaintiffs' counsel."  *Monaco II*, at *46, n. 43 (citing Pls.' Aff. Supp. Class Cert. Mot. ¶ 13).

[10]  There is a dispute as to whether the Civil Commitment Subclass includes all individuals subject to civil commitment in the counties comprising the Eastern District of New York or only those found incompetent to stand trial who are subsequently subject to civil commitment evaluations.  For the reasons set forth below, it is not necessary to decide the issue.

[11]  The Civil Commitment Subclass has settled its claims with the HHC. The Incompetency Sub-subclass settled its claims with the DOC on May 26, 2004. *See* Docket Entry # 386 ("Stipulation and Order of Settlement Concerning Counsel Fees, Costs, Expenses, and Disbursements with Respect to Claims Against the City Defendants").

On December 17, 2004, plaintiffs filed a Fifth Amended
Complaint. The causes of action relevant to these motions are
one, two, seven through nine, and eleven.[12]

The First Cause of Action alleges:

> By maintaining a system by which defendants who may
> lack capacity to stand trial are required to remain in
> jail for a period of up to thirty days or longer while
> a question of capacity is before the local criminal
> court, defendant Cahill and the defendant class of
> judges violate the Due Process Clause of the Fourteenth
> Amendment to the United States Constitution and 42
> U.S.C. § 1983 because the duration of confinement does
> not bear a reasonable relation to its purpose.

Fifth Amended Complaint (hereinafter "FAC") ¶ 190.

The Second Cause of Action alleges:

> By failing to notify OMH of the existence of an
> incompetent defendant who may well be found incompetent
> to stand trial during a period of time that would
> enable OMH to designate a facility to which the
> defendant could be sent if he was found incompetent
> prior to the date of the incompetency hearing defendant
> Cahill and the defendant class of judges violate the
> Due Process Clause of the Fourteenth Amendment to the
> United States Constitution and 42 U.S.C. § 1983 because
> the duration of the confinement of the incompetent
> defendant does not bear a reasonable relation to its
> purpose and such deprivation of liberty is not the
> least intrusive possible while meeting the legitimate
> interests of the state.

FAC ¶ 192.

---

[12] As a means of managing discovery, plaintiffs and defendant
Commissioner, with the approval of the Court, agreed to focus upon causes of
action seven through eleven, as applied to two facilities operated by OMH, one
to be selected by the Commissioner, and the other by plaintiffs. This
agreement was without prejudice to further prosecution or defense, if
warranted. *See* 7/28/2005 Minute Entry. The Commissioner selected Creedmoor
Psychiatric Center ("Creedmoor"), in Queens, and the plaintiffs selected
Hudson River Psychiatric Center ("Hudson River"), in Poughkeepsie, as the OMH
facilities.

The Seventh Cause of Action alleges:

As a result of physicians at OMH and HHC operated facilities, Stony Brook and NUMC certifying individuals who have been evaluated for civil commitment purposes as dangerous because the physicians believe that such individuals' clinical condition warrants in-patient care and treatment, defendants Carpinello, Chu, Skodnek, Sedler, and Licht are responsible for the confinement of nondangerous individuals, which violates the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

FAC ¶ 202.

The Eight Cause of Action alleges:

By failing to examine and employ significant criteria related to the likelihood of causing harm when examining allegedly mentally ill individuals for civil commitment purposes, physicians at OMH and HHC operated facilities, Stony Brook and NUMC make clinical determinations that do not promise some degree of accuracy and such decisions result in the confinement of nondangerous individuals, both of which violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

FAC ¶ 204.

The Ninth Cause of Action alleges:

By conducting clinical evaluations that frequently do not last more than five or ten minutes when examining allegedly mentally ill individuals for civil commitment purposes, physicians at OMH and HHC operated facilities, Stony Brook, and NUMC make clinical determinations that do not promise some degree and accuracy and such decisions result in the confinement of nondangerous individual [sic], both of which violate the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

FAC ¶ 206.

The Eleventh Cause of Action alleges:[13]

> The failure of physicians at OMH and HHC operated facilities, Stony Brook and NUMC to use guidelines that inform physicians of the likelihood and magnitude of harm that must exist before a physician certifies a mentally ill person for hospitalization results in the arbitrary exercise of physicians at OMH and HHC operated facilities, Stony Brook and NUMC when they certify an allegedly mentally ill person for involuntary hospitalization, which violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

FAC ¶ 210.[14]

---

[13]  The Tenth Cause of Action is not asserted against OMH facilities or employees and is thus not at issue here.  This cause of action provides:

> By failing to apply the statutory criteria of the provisions of the New York Mental Hygiene Law pursuant to which the physicians act, physicians at HHC operated facilities, Stony Brook, and NUMC violate the procedural component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

FAC ¶ 208.

[14]  I list the remaining causes of action not already quoted above, although they are not the subject of defendants' motions.

The Third Cause of Action, asserted on behalf of the Incompetency Subclass, alleges:

> By automatically subjecting plaintiff Greg Monaco and the plaintiff class members to either the requirements of CPL § 730.60, MHL § 29.11(h) and 14 NYCRR Part 540 or an informal forensic review, while not automatically subjecting civilly admitted patients to the same provisions or informal process, defendant Carpinello denies such individuals equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

FAC ¶ 194.

The Fourth Cause of Action, asserted on behalf of the Incompetency Subclass, alleges:

> By failing to designate a facility to which an incompetent defendant is to be transferred prior to the date of a hearing on a defendant's capacity, defendant Carpinello violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 because such failure to act results in confinement of incompetent defendants the duration of

which does not bear a reasonable relation to its purpose and such deprivation of liberty is not the least intrusive possible while meeting the legitimate interests of the state.

FAC ¶ 196.

The Fifth Cause of Action, asserted on behalf of the Incompetency Subclass, alleges:

The involuntary confinement by defendant Carpinello of the plaintiff and plaintiff class members who are not dangerous but for whom there has been no out-patient residence obtained violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

FAC ¶ 198.

The Sixth Cause of Action, asserted on behalf of the Incompetency Subclass, alleges:

By failing to immediately transfer Mr. Monaco and other incompetent defendants from the time they receive notification of an OMH designation, defendants Tisch and Horn violate the violate the [sic] Fourth and Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 because such failure to act results in the unnecessary confinement of incompetent defendants for whom there is no necessary basis to believe satisfies the civil commitment criteria, further results in confinement of incompetent defendants whose nature does not bear a reasonable relation to its purpose and such deprivation of liberty is not the least intrusive possible while meeting the legitimate interests of the state.

FAC ¶ 200.

The Twelfth Cause of Action, asserted on behalf of the Civil Commitment Subclass, alleges:

As a result of certifying individuals who have been evaluated for civil commitment purposes as dangerous because it is believed that such individuals' clinical condition warrants in-patient care and treatment, physicians at HHC operated facilities and NUMC falsely imprison members of the civil commitment [sic].

FAC ¶ 212.

The Thirteenth Cause of Action, asserted on behalf of the Civil Commitment Subclass, alleges:

By failing to examine significant criteria related to the likelihood of causing harm when examining allegedly mentally ill individuals for civil commitment purposes, physicians at HHC operated facilities and NUMC negligently diagnose members of the civil commitment subclass and such action results in the wrongful confinement of non-dangerous individuals.

III.  <u>Factual Background Relevant to Defendant Commissioner's</u>
<u>Motion for Summary Judgment</u>

     The following facts are taken from the parties' submissions

in connection with these motions as well as the Local Rule 56.1

statements.  Disputes are noted.

     Creedmoor is the receiving hospital for individual requiring

intermediate and extended care who reside in Queens.  Iverson

Affidavit in Support of Comm'r's Motion for Summary Judgment

(hereinafter "Iverson Aff. ¶ __") ¶ 2.[15]  Hudson River is the

receiving hospital for individuals requiring intermediate and

extended care who reside in the counties of Dutchess, Putnam, and

Ulster.  Shriver Affidavit in Support of Comm'r's Motion for

_____

FAC ¶ 214.

     The Fourteenth Cause of Action, asserted on behalf of the Civil
Commitment Subclass, alleges:

     By conducting clinical evaluations that frequently do not last
     more than five or ten minutes when examining mentally ill
     individuals for civil commitment purposes, physicians at HHC
     operated facilities and NUMC negligently diagnose members of the
     civil commitment subclass and such action results in the wrongful
     confinement of nondangerous individuals.

FAC ¶ 216.

     The Fifteenth Cause of Action, asserted on behalf of the Civil
Commitment Subclass, alleges:

     By failing to apply the statutory criteria of the provisions
     of New York Mental Hygiene Law pursuant to which the physicians
     act, physicians at HHC operated facilities and NUMC falsely
     imprison members of the plaintiff subclass of individuals facing
     civil commitment.

FAC ¶ 218.

     [15]  Iverson is the Executive Director of Creedmoor.

Summary Judgment (hereinafter "Shriver Aff. ¶ __") ¶ 2.[16]

According to defendant Commissioner, the patients at Creedmoor

and Hudson River are individuals whose mental illnesses are so

severe that they are unable to function safely in the community.

Iverson Aff. ¶ 3; Shriver Aff. ¶ 3.  Plaintiff contends that the

institutions confine nondangerous patients who can function

independently in the community.  Lubit Affidavit in Opposition to

Comm'r's Motion for Summary Judgment (hereinafter "Lubit Aff. ¶

__") ¶¶ 30; 35-54.[17]

Many patients admitted to Creedmoor and Hudson River are

transferred from other hospitals that are unable to provide

intermediate or extended care, or sent from prisons or jails

after having been found incompetent to stand trial on criminal

charges, pursuant to CPL § 730.40, or not responsible by reason

of mental disease or defect, pursuant to CPL ¶ 330.20.  Iverson

Aff. ¶ 3; Shriver Aff. ¶3.  Other patients are admitted to

Creedmoor on an emergency basis from crisis residences or

outpatient programs.  Iverson Aff. ¶ 3.  Neither Creedmoor or

Hudson River admits patients directly from the general community.

Iverson Aff. ¶ 3; Shriver Aff. ¶3.

Drs. Julius LaGuerre, Mitchell Barden, Franck Paul, Pushpa

---

[16]  Shriver is the Director of Clinical Services at Hudson River.

[17]  Dr. Lubit is a physician licensed in New York and is board certified
in psychiatry and neurology, child and adolescent psychiatry, and forensic
psychiatry. At the Clinic's request, he reviewed the files of certain patients
involuntarily committed to Creedmoor or Hudson River.

Patil, and Kantilal Shah are psychiatrists at Hudson River who conduct civil commitment evaluations. Drs. Cynthia de los Santos, Syamala Das, Baljit Singh, and Aneta Predanic are psychiatrists at Creedmoor who conduct civil commitment evaluations.

When an individual arrives from another hospital or a jail, Creedmoor and Hudson River are given certain information about that person. Das Tr. 92-93; Shriver Tr. 73-75. If the individual is transferred from another hospital, Creedmoor and Hudson River have a referral packet containing information about the patient that was obtained by the transferring hospital. *Id*. The referral packet contains, among other things, an initial psychiatric assessment, a social assessment, a physical assessment, laboratory reports, progress notes, and information about medications. *Id*. If the individual is sent from jail, Creedmoor and Hudson River receive a designation form prepared by OMH's Bureau of Forensic Services, which lists the patient's name, address, age, and criminal charge. Das. Tr. 68; Shriver Tr. 104. They also receive two examination reports for each patient completed by psychologists or psychiatrists who were appointed by local criminal courts to examine the individuals to assess their capacity to stand trial. *Id*. If an individual was admitted previously to Creedmoor or Hudson river, discharge summaries from the previous admissions and the individual's chart

are also available.  Das Tr. 76-77; Shriver Tr. 83.

On the day that an individual arrives at Creedmoor or Hudson River, a psychiatrist conducts an initial evaluation of the patient.  Iverson Aff. ¶ 5; Shriver Aff. ¶ 5.  The psychiatrist must complete an initial assessment, or screening, form.  *Id.* The initial assessment forms elicit information about, *inter alia*, the history of the present illness and the chief complaint, the individual's psychiatric, medical, substance abuse, and family history, risk factors, and the individual's mental status and admitting diagnosis.  Iverson Aff., ¶ 5 & Exhs. A & B; Shriver Aff. ¶ 5 & Ex. A.

In addition to the psychiatric evaluation, other evaluations are conducted on the day that an individual arrives at Creedmoor or Hudson River.  Iverson Aff. ¶ 7; Shriver Aff. ¶ 7.  A physician conducts a physical exam and completes a physical evaluation form.  *Id.* A nurse also conducts an examination and completes an assessment form.  *Id.* A social worker may also interview a patient, if there is time.  *Id.*

When the process for involuntary commitment under MHL § 9.27 begins, an application for involuntary commitment is completed and two psychiatrists are assigned to conduct, separately, involuntary commitment evaluations.  Iverson Aff. ¶¶ 9-11; Shriver Aff. ¶¶ 9-11.  These psychiatrists also have at their disposal the initial forms completed upon a patient's arrival, as

well as any other records that are from prior admissions or sent by local hospitals or jails.  Iverson Aff. ¶¶ 11-13; Shriver Aff. ¶¶ 11-13; Shar Tr. 277; Singh Tr. 224, 228-29; Paul Tr. 51; Predanic Tr. 67-68.

If the psychiatrists determine that the patient is mentally ill and poses a danger to himself or others, each completes a certificate to that effect, pursuant to MHL § 9.27.  Iverson Aff. ¶ 14; Shriver Aff. ¶ 14.  A third psychiatrist, who is a member of the facilities staff, must then confirm that the admission is warranted.  Iverson Aff. ¶ 15; Shriver Aff. ¶ 15.  Pursuant to MHL § 9.27, the two certificates and the confirmation from the third psychiatrist authorize the director of the facility to commit the patient involuntarily.

The parties agree that there are three methods to assessing risk; the actuarial, the structured professional judgment, and the clinical judgment methods.  Norko Tr. 31[18] & Peeples Declaration in Support of Comm'r's Motion for Summary Judgment (hereinafter "Peeples Dec.") Exhs. B & F.  Neither party disputes that the clinical judgment method or, as some of plaintiffs' witnesses refer to it as, the unstructured professional judgment method, is the standard method used to assess risk in the psychiatric community.  *See* Commissioner's Local Rule 56.1

---

[18]  Dr. Michael Norko is an Associate Professor of Psychiatry at the Yale School of Medicine, hired by defendant Commissioner to opine on the case.

Statement (hereinafter "Def.'s Stmt. ¶ __") ¶ 102; Plaintiffs'
Local Rule 56.1 Counter-Statement (hereinafter "Pls.' Ctr. Stmt.
¶ __") ¶ 102; *see also* Rosenfeld Tr. 74-76.[19]  Under this method,
the clinician reaches an opinion about whether an individual
poses a risk of harm based on his or her evaluation of the
individual using his or her observation of and professional
judgment about risk factors relevant to harm.  Rosenfeld Tr. 59-
60; Norko Tr. 90, 101-02; Peeples Dec. Ex. B.[20]

        The most pertinent risk assessment factors regarding
dangerousness to others are the presence of "threat/control
override" psychotic symptoms; the presence of co-morbid substance
abuse; medication non-compliance; prior episodes of serious
violence; the lack of stable environmental resources (e.g.
relationships, employment, homelessness), insight and compliance
with necessary treatment regiments; and the stability of current
symptoms.  Rosenfeld Affidavit in Opposition to Comm'r's Motion
for Summary Judgment (hereinafter "Rosenfeld Aff. ¶ __") ¶ 2.
Other factors include anger, command hallucinations to act
violently, violent fantasies, and abuse as a child.  *Id*; Lubit
Aff. ¶ 13.

---

[19]  Dr. Barry Rosenfeld is a licensed clinical psychologist and
Professor at Fordham University hired by plaintiffs to opine on the case.

[20]  No body or organization that has any role in certifying or
accrediting, regulating, or overseeing psychiatric hospitals has published or
announced any statements, guidelines, or requirements on how to conduct
involuntary commitment evaluations.  Comm'r's Mem. at 21.

Known risk factors relating to suicide include the presence of mood disorders, divorce, prior suicide attempts, suicidal intent, firearms in the home, a humiliating event, and hopelessness. Lubit Aff. ¶ 18. Key factors for assessing danger because of an inability to meet one's needs include whether a person is meeting his medical needs, the individual's nutritional state, the current climate and environment and the individual's ability to clothe, feed, and medicate himself accordingly, and support from the community. Lubit Aff. ¶ 19.

According to defendant Commissioner, the psychiatrists who have conducted the evaluations at Creedmoor and Hudson River assessed the individuals' dangerousness as well as their mental status and that they believed those whom they certified as dangerous were, in fact, dangerous. Barden Tr. 8-10, 16, 46-47; Paul Tr. 8-11, 20-21, 23-24, 83-88, 111-13, 117, 164-70, 221-23, 239-42, 244-47, 259-61; Shah Tr. 35-36, 131-37, 150-52, 163-66, 232-34, 253-55; LaGuerre 2001 Tr. 41-44, 59-61; LaGuerre 2006 Tr. 5-7, 29-30, 33-34, 45-48, 62-64, 68-70, Ex. 1; Patil 2001 Tr. 8-10; Patil 2006 Tr. 4-7 & Ex. 1; Singh Tr. 15-16, 32, 35, 105-07, 161, 235-36, 242-44, 251-57, 270-71; Das Tr. 16, 50-52; De Los Santos Tr. 12, 31, 57-60, 64-67; Predanic Tr. 9, 51, 54-55, 144-47, 148-51.

According to the Clinic, however, various psychiatrists at Creedmoor and Hudson River could not have concluded that at least

23 of the 464 individuals involuntarily committed during the relevant period posed a danger to themselves or others. *See* Lubit Aff. ¶¶ 35-54. Plaintiffs also dispute the accuracy of the clinical judgment method and assert that evaluations under the method are accurate at a level no greater than chance. Rosenfeld Aff. ¶ 13.

There is no dispute that all the psychiatrists who conduct initial psychiatric assessments and involuntary commitment evaluations at Creedmoor and Hudson River are licensed to practice medicine by the State of New York, and have completed the necessary schooling, training, and residencies. It is also undisputed that psychiatrists at Creedmoor and Hudson River receive and give presentations and training on risk assessment issues, although the psychiatrists are not formally tested on this knowledge.

IV. <u>Factual Background Relevant to Defendant Cahill's</u>
<u>Motion for Abstention and Dismissal or, In the Alternative, to</u>
<u>Decertify the Defendant Class</u>

For the purposes of defendant Cahill's motion, it is sufficient to state the following. Local criminal courts typically rule on whether a criminal defendant lacks capacity to stand trial within two to four weeks of the date that the court first orders a competency evaluation. Alexander Tr. 6-9, 13-14;

Jolie Tr. 11-13; Velte Tr. 14-16.[21] If the defendant is found incompetent, the final order of observation is sent by the Court's clerk, typically by mail, to OMH. Alexander Tr. 16-17, 21; Jolie Tr. 18; Velte Tr. 27. Once a facility is designated by OMH, the defendant is transferred to that facility, usually by the Sheriff. *See* Murphy Tr. 8-9.[22]

Generally, in Dutchess County, individuals are transported to the designated OMH facility within three days of the time the Sheriff receives the order of observation. *Id*. at 33-34. Of the twenty-two individuals admitted to Pilgrim Psychiatric Center, in Suffolk County, however, over the course of a one and one-half year period from January 2005 through August 2006, six individuals waited in jail four or more days for admission following the issuance of a final order of observation and four waited six days or more. Brooks Declaration in Opposition to Defendant Cahill's Motion to Dismiss (hereinafter "Brooks Cahill Dec.") Ex. I.

**Discussion**

I. <u>Defendant Commissioner's Motion for Summary Judgment</u>

A court must grant a motion for summary judgment if the

---

[21] Irene Alexander is the Court Director and Chief Clerk of the Riverhead Justice Court; Cheryl Jolie is the Deputy Chief Clerk of the Poughkeepsie City Court; and Barry Velte is the Senior Court Office Assistant for the Suffolk County District Court.

[22] Peter Murphy is a Corrections Sergeant with the Dutchess County Sheriff's Office.

movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id*.

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900

F.2d 566, 568 (2d Cir. 1990).  Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings.  *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).  In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

A.  EIGHTH CAUSE OF ACTION[23]

As discussed above, in order to commit an individual under Article 9 of New York's Mental Hygiene Laws, a psychiatrist must determine that the individual poses a substantial risk of harm to himself or others.  "[D]ue process does not require a guarantee that a physician's assessment of the likelihood of serious harm be correct . . ."  *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir. 1995)*.*  The Second Circuit continued that "due process does demand that the decision to order an involuntary [] commitment be made in accordance with a standard that promises some reasonable degree of accuracy."  *Id*. at 1062.  Lastly, the Second Circuit stated:

Though committing physicians are not expected to be

---

[23]  The Seventh Cause of Action will be discussed after the Eighth.

omniscient, [MHL § 9.39] implicitly requires that their judgment-affecting whether an individual is to be summarily deprived of her liberty-be exercised on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community. Due process requires no less.

*Id.* at 1063.

Plaintiffs contend that *Rodriguez* stands for the proposition that, even if the generally accepted standards within the psychiatric community are used, due process is not satisfied when they do not promise a reasonable degree of accuracy. Plaintiffs' Opposition to Defendant Comm'r's Motion for Summary Judgment (hereinafter "Pls.' Opp. ___") 22. Contrary to plaintiffs' argument, however, the final quotation in the preceding paragraph demonstrates that the Second Circuit has equated a "reasonable degree of accuracy" with a professional judgment standard. Moreover, in *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982), the Supreme Court made clear that a physician's decision is presumptively valid and liability may be imposed only when an action is a substantial departure from accepted professional judgment, practice, or standards.[24]

---

[24] Plaintiffs attempt to distinguish *Youngberg* by arguing that the decision in that case concerned the obligations of clinicians to provide treatment rather than the deprivation of liberty at issue in this case. Second Circuit case law has not made any such distinction and plaintiff has cited only an article from the Yale Law Journal in support of its argument that the two situations should be treated differently. Pls.' Opp. 24 (citing Susan Stefan, *Leaving Civil Rights to the "Experts": From Deference to Abdication Under the Professional Judgment Standard*, 102 Yale L.J. 639, 667-670 (1992)).

Courts interpreting *Rodriguez* also equate accuracy with a professional judgment standard. *See Monaco v. Carpinello*, 2004 WL 3090598, at *8 (E.D.N.Y. Jul. 22, 2004) ("*Monaco III*") (due process requires that involuntary commitment determinations be made in accordance with a standard that must not fall substantially below that which is generally accepted in the medical community) (citing *Katzman v. Kahn*, 67 F. Supp.2d 103, 109-10 (E.D.N.Y. 1999)); *Fisk v. Letterman*, 501 F. Supp.2d 505, 524 (S.D.N.Y. 2007) (granting summary judgment on claim that commitment violated right to substantive due process where plaintiff presented no evidence that doctor's determination that she presented a danger to herself or others fell below generally accepted medical standards); *Dove v. City of New York*, 2005 WL 2387587, at *3 (E.D.N.Y. Sept. 28, 2005); *see also Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 191 (2d Cir. 2005) (overturning jury verdict rendered in favor of person involuntarily committed because jury was not competent to evaluate the professional propriety of the defendant doctors' actions without the assistance of expert testimony). Plaintiffs have cited no decision in which a court concluded that due process was not satisfied when physicians conformed to generally accepted medical standards.

It is undisputed that psychiatrists at Creedmoor and Hudson River are to use the clinical method, and that this method is the

standard method in the psychiatry community used to assess risk. Def.'s Stmt. ¶ 102-03; Pls.' Ctr. Stmt. ¶ 102-03. Plaintiffs cannot show a due process violation simply on the ground that psychiatrists at Creedmoor and Hudson River use the clinical method.

Plaintiffs further argue, however, that, even if OMH psychiatrists use the clinical method, their clinical evaluations fall below generally accepted medical standards because they fail to examine and employ significant criteria. Pls.' Opp. 25.[25] Dr. Lubit has submitted a report setting forth the various risk factors that psychiatrists use in assessing dangerousness. Peeples Dec. Ex. H. There is no genuine dispute that most of the criteria set forth by Dr. Lubit, including those that are most important, such as command hallucinations and substance abuse, are generally accepted in the medical community as indicative of risk.[26] Moreover, Dr. Lubit, having reviewed the patients' hospital records and deposition transcripts of the committing

---

[25] I note that this argument more closely tracks the language of plaintiffs' Eighth Cause of Action. *See supra*. Indeed, the Eighth Cause of Action alleges only that OMH psychiatrists (and others) failed to examine and employ significant criteria in their commitment decisions. It does not allege that this failure was due to adherence to generally accepted medical standards.

[26] Defendant Commissioner argues that the factors set forth by Dr. Lubit cannot be used to establish a due process violation because they are derived from a study described by the parties as the MacArthur Study. Comm'r Rep. 10. Defendant originally noted, however, that OMH psychiatrists are familiar with, and use, many of the same risk factors that Dr. Lubit identified as the most important. Comm'r's Mem. at 34, n. 13. Thus, defendant's argument is unpersuasive.

physicians, concluded that, to a reasonable degree of clinical certainty, 23 individuals were not dangerous. Lubit Aff. ¶¶ 35-54.

Defendant Commissioner argues that Dr. Lubit's conclusion that the individuals were not dangerous "to a reasonable degree of medical certainty" is not the same as saying that no reasonable psychiatrist could conclude that the 23 individuals met the criteria for involuntary commitment. Accordingly, defendant argues, plaintiff has failed to show that the committment decisions at issue are such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the psychiatrists responsible actually did not base their decisions on their professional judgment.[27] *Youngberg* 457 U.S. at 323.

Dr. Lubit did indeed decline to testify that a psychiatrist could not reasonably conclude that these individuals met the criteria for involuntary commitment. Lubit Tr. 379-83, 387-88. Dr. Lubit's hesitancy, however, was based on his need "to better understand what [was meant] by reasonably conclude and how it differs from someone saying that to a reasonable degree of medical certainty something was true." Lubit Tr. 389. He did testify that "I could not understand how people could have felt .

---

[27] Defendant Commissioner also points out that five of these individuals were adjudicated dangerous in later state court proceedings.

. . these particular individuals met criteria so perhaps that is saying that I did not feel the conclusions were reasonable." Lubit Tr. at 383; *see also id.* at 388; Lubit Aff. ¶ 4.[28]

Accordingly, plaintiffs, through the report and testimony of Dr. Lubit, have submitted sufficient evidence from which a trier of fact could conclude the evaluations done by OMH psychiatrists fell substantially below generally accepted medical standards and thus did not promise a reasonable degree of accuracy. *See Fisk*, 501 F. Supp.2d at 522 (plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards); *see also Olivier*, 398 F.3d at 191 (plaintiff's failure to submit evidence as to medical standards meant that there was no legally sufficient basis for a reasonable jury to find for plaintiff on claim that involuntary committment did not meet generally accepted medical community standards); *Rodriguez*, 72 F.3d at 1065 (an expert affidavit asserting that the treating physicians made incorrect and objectively unreasonable decisions created an issue of fact for trial regarding whether the doctors acted within the realm of

---

[28] Defendant Commissioner argues that, to the extent Dr. Lubit's affidavit attempts to offer opinions that vary from those expressed in his report and deposition, they should be disregarded. Dr. Lubit's affidavit, however, is consistent with report and testimony.

professional competence in treating the plaintiff).[29][30]

      i.  *Psychiatrists Actions Do Not Shock the Conscience*

In *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) the Supreme Court held that to make out a substantive due process claim, a plaintiff must establish that the challenged conduct shocks the conscience. Defendant Commissioner argues that to succeed on their Eighth Cause of Action plaintiffs must not only demonstrate an issue of fact as to whether the conduct of OMH psychiatrists falls below accepted medical standards but also show the method of conducting commitment evaluations generally, as well as individual evaluations, at Creedmoor and Hudson River shocks the conscience. *See* Comm'r's Mem. 38-41. Plaintiffs argue that this standard is not applicable in the civil commitment context. Pls.' Opp. 26. Neither side cites any authority directly on point.

In *Rodriguez*, which concerned civil commitment, the Second

---

[29] Defendant Commissioner's citation to *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) is inapposite. In *Kulak*, the plaintiff's expert submitted affidavits asserting that, because he concluded plaintiff was not psychotic, it was an abuse of discretion for the defendants to prescribe certain drugs. The Second Circuit noted that this conclusion failed to create an issue of fact because the expert did not state the finding that plaintiff was psychotic fell below accepted medical standards. In this case, Dr. Lubit has articulated the applicable standards and his understanding that, to a reasonable degree of medical certainty, the 23 committed individuals did not meet those standards.

[30] Plaintiffs further contend that, separate and apart from simply failing to properly apply known risk factors, OMH psychiatrists commit individuals solely based on the presence of mental illness and a belief that inpatient treatment is required, regardless of dangerousness. Pls.' Opp. 25. If based on this ground, however, this Cause of Action would be duplicative of the Seventh, discussed *infra*.

Circuit reversed the district court's grant of summary judgment, concluding there was a triable issue of fact as to whether the actions of a physician who committed plaintiff fell substantially below generally accepted medical standards, but did not discuss any additional factors required to demonstrate liability. *Rodriguez*, 72 F.3d at 1061-65. Other Circuits, however, have explicitly required a showing that the conduct at issue in an involuntary commitment shocks the conscience. *Benn v. Univ. Health Sys., Inc.*, 371 F.3d 165, 174 (3d Cir. 2004); *see also Norris v. Engles,* 494 F.3d 634, 638 (8th Cir. 2007); *James v. Grand Lake Mental Health Center, Inc.,* 161 F.3d 17 (Table) (10th Cir. 1998) (involuntary commitment claims must be brought under Fourth Amendment, but even if brought under due process, plaintiff failed to show conduct shocked the conscience). Further, two cases in the Northern District of New York have required a plaintiff to allege conduct that satisfied this standard in the civil commitment context. *See Abascal v. Hilton,* 2008 WL 268366 (N.D.N.Y. Jan. 30, 2008); *Disability Advocates, Inc. v. McMahon*, 279 F. Supp.2d 158 (N.D.N.Y. 2003).[31]

The Second Circuit has applied the "shocks the conscience" standard in a variety of contexts. *Russo v. City of Bridgeport*,

---

[31] Although other involuntary civil commitment cases in the Second Circuit, cited by plaintiffs, do not refer to this standard either, these cases arise in situations where it was not relevant. *See, e.g.*, *Project Release v. Prevost*, 722 F.2d 960, 971 (2d Cir. 1983) (upholding facial validity of New York's civil commitment scheme); *Glass v. Mayas*, 984 F.2d 55, 57 (2d Cir. 1993) (qualified immunity).

479 F.3d 196, 209-10 (2d Cir.), *cert. denied*, 128 S. Ct. 109 (2007) (failure of police officers to investigate and turn over to prosecutor exculpatory evidence causing arrestee to remain incarcerated for prolonged period); *Lombardi v. Whitman*, 485 F.3d 73 (2007) (failure to provide accurate information to rescue workers concerning air quality in lower Manhattan following September 11, 2001 terrorist attacks did not shock the conscience); *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (applying shocks the conscience standard to substantive due process claim of teacher who was placed on involuntary sick leave when he refused to submit to psychiatric exam and sign a broad medical release); *Natale v. Town of Ridgefield*, 170 F.3d 258, 262-63 (2d Cir. 1999) (applying standard and holding that jury should have been given charge that conduct of the defendants in denying the building permits was so outrageously arbitrary as to constitute a gross abuse of governmental authority); *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (prisoner's two day administrative confinement pending disciplinary hearing was not arbitrary or conscience-shocking in the constitutional sense). Moreover, the Second Circuit has stated that "it should go without saying that due process must be evaluated under a standard that allows physicians to operate effectively to protect the interests of the individuals about whom they make such judgments and of the public." *Olivier*, 398 F.3d at 189 (citing

*Youngberg*, 457 U.S. at 320).

In addition, the shocks the conscience standard recognizes "the dilemma of conflicting obligations." *Lombardi*, 485 F.3d at 82. The Second Circuit has acknowledged the competing obligations psychiatrists making a civil commitment decision face. *Olivier*, 398 F.3d at 198 (noting physicians must be able "to operate effectively to protect the interests of the individuals about whom they [make assessments of risk] and of the public"); *see also Lombardi*, 485 F.3d at 82 ("In the apparent absence of harmless options at the time decisions must be made, an attempt to choose the least of evils is not itself shocking"). Because the standard has been applied in a wide variety of contexts and because application in the civil commitment context would recognize the difficultly and uncertainty of risk assessment and the competing obligations faced by psychiatrists, I conclude plaintiffs must show that the psychiatrists' conduct shocks the conscience.

The Second Circuit has read the shocks the conscience requirement "to mean that while 'a purpose to cause harm' might be required in a situation such as a high-speed chase, 'deliberate indifference' - but not negligence - can support a finding of liability in situations where the government owes a special duty of care to those in its charge." *Russo*, 479 F.3d at 209-10. Whether an individual was brought to an OMH facility

pursuant to a final order of observation or was evaluated

following initial admission pursuant to §§ 9.27, 9.37, or 9.39,

the individual is in the custody of the state during the period

he is evaluated by OMH psychiatrists.  Accordingly, the

deliberate indifference standard applies.

Deliberate indifference is defined as the reckless disregard

of a risk of harm of which a person is aware.  *See Farmer v.

Brennan*, 511 U.S. 825, 837 (1970).  The Second Circuit has noted,

however, that there is a "potent qualification" to the deliberate

indifference standard:

> Deliberate indifference that shocks in one environment
> may not be so patently egregious in another, and our
> concern with preserving the constitutional proportions
> of substantive due process demands an exact analysis of
> circumstances before any abuse of power is condemned as
> conscience-shocking.

*Lombardi*, 485 F.3d at 82 (citing *Lewis*, 523 U.S. at 850).

Although plaintiffs have created a triable issue of fact as

to whether OMH psychiatrists failed to consider all the relevant

criteria of dangerousness in certain cases, all of the

psychiatrists testified that they at least assessed dangerousness

and plaintiffs have not shown that the psychiatrists committed

anyone they did not believe to dangerous.[32]  Trainings, if not

tests, are held on identifying and assessing risk.  There is also

---

[32] For the reasons set forth below, in the discussion of the Seventh
Cause of Action, the argument that these decisions are pretextual cannot be
used to support a conclusion that the psychiatrists acted with deliberate
indifference.

no evidence that the psychiatrists, much less defendant
Commissioner, were aware that their methods of assessing risk
might result in erroneous findings of dangerousness.  As
deliberate indifference requires an actor to be aware of the risk
of harm plaintiffs have failed to make this required showing.
Accordingly, defendant Commissioner's motion for summary judgment
on plaintiffs' Eighth Cause of Action is granted.

    B.  <u>SEVENTH CAUSE OF ACTION</u>

    The Seventh Cause of Action asserts that because
psychiatrists at Hudson River and Creedmoor improperly detain
individuals known not to be dangerous because the psychiatrists
believe the individuals nevertheless require inpatient treatment
and care, defendant Commissioner is responsible for the
confinement of nondangerous individuals, in violation of the
individuals' due process rights under the Fourteenth Amendment.
The Second Circuit has not determined if the subjective intent of
a committing psychiatrist has any implications for due process
analysis.  *Olivier*, 398 F.3d at 191-192.  For the reasons set
forth below, I need not decide the issue as plaintiffs "did not
elicit evidence sufficient to establish to the satisfaction of a
reasonable jury that the [OMH psychiatrists] acted for
non-medical or otherwise improper reasons in having [certain
individuals] temporarily committed."  *Id*.

    Defendant Commissioner argues that there is no evidence that

physicians certify patients as dangerous even though they do not
believe the patients to actually be so.  Indeed, every OMH
psychiatrist at Creedmoor and Hudson River testified that they
believed the individuals they committed were dangerous.
Plaintiffs argue that there is evidence from which a reasonable
factfinder could conclude that the psychiatrists' findings of
dangerousness are pretextual and that, accordingly, there is a
triable issue of fact as to whether the dangerousness assessments
are substantially below generally accepted standards.  Pls.' Opp.
32-35.[33]

Plaintiffs point first[34] to the deposition of Dr. Das, who
testified, in response to a question of whether Creedmoor can
retain a § 730.40 patient if the patient does not so desire,
stated, "In my mind there are only two things, either they are
involuntary – I mean either they give them the option to sign
voluntary otherwise they meet the criteria for involuntary."
Das. Tr. 66.  Immediately prior to this response, however, Dr.
Das testified, in response to essentially the same question, that
an individual could be retained beyond 72 hours, if he did not
wish to be committed, "only if they meet the criteria for

---

[33]  Plaintiffs do not specify the cause of action to which this argument
is relevant.  For the reasons set forth below, I find it applicable to the
Seventh Cause of Action.

[34] Plaintiff argues that at least 20 years ago, OMH "moved very slowly"
to direct compliance with the law that required a finding of dangerous.  Pls.'
Opp. 6-7.  Such distant conduct does not bear on this case, which seeks
prospective injunctive relief.

involuntary admissions, convert them to involuntary.  So it has to be there." *Id*.  Accordingly, in context, Dr. Das's statement must be interpreted to mean that she believes that an individual may be committed only upon consent or upon a finding that the criteria for involuntary commitment are met.

Plaintiffs also point to portions from the deposition testimony of Dr. Shah.  The sections cited do not support the Clinic's contention that Dr. Shah believes he cannot find a patient remanded pursuant to CPL § 730.40[35] ineligible for civil commitment, thereby requiring his release.  Pls.' Opp. 33 (citing Shah Tr. 69-70, 97-100).

Plaintiffs further suggest that Dr. LaGuerre testified that the prevailing philosophy is "commit first, ask questions later." Pls.' Opp. 33 (citing LaGuerre Tr. at 122-23).  Dr. LaGuerre never said these words.  Rather, Dr. LaGuerre acknowledged that he would not seek out alternate forms of care until after commitment.  *Id*. at 122-23.  He unequivocally testified earlier that he applied the relevant risk factors before certifying any individual for treatment.  *Id*. 11-18.  Finally, contrary to plaintiffs' assertion, Dr. LaGuerre did not testify that he failed to apply relevant risk factors upon commitment.  Rather, after discussing an article on risk assessment and management, he testified that he usually applied this information at the

---

[35]  Plaintiff argues that the Civil Commitment Subclass comprises only individuals remanded pursuant to § 730.40.  Pls.' Opp. at 28.

discharge stage. *Id.* at 128-29. As noted, he previously testified he applied the risk factors at the commitment stage.[36]

Similarly, that three psychiatrists cannot recall any instance in which they concluded that a patient needed hospitalization but nevertheless found that the patient was not dangerous, Pls.' Opp. 34 (citing Shah Tr. at 42, LaGuerre Tr. at 53, and Barden Tr. at 82), does not show that the committed patients were not in fact dangerous, that the psychiatrists did not believe them to be so, or that there were no such instances.

Plaintiffs lastly argue that an examination of certain individual commitment decisions demonstrates there is a question of fact as to whether physicians fail to adhere to legal constraints when the legal requirements interfere with their clinical decision making.[37] Plaintiff contends that Drs. Paul, LaGuerre, De Los Santos, and Singh, among others, certified individuals for civil commitment without considering all the relevant risk assessment criteria. Pls.' Opp. 34-37. Each of these doctors, however, explained why they thought the individuals they committed were dangerous.

---

[36] Plaintiffs also argue that Dr. Barden does not know the standards set forth in MHL § 9.37. Review of Dr. Barden's deposition transcript, however, demonstrates that he testified to his understanding that an individual must have a mental illness that causes him to be imminently dangerous to himself or others, which is a generally correct paraphrase of the statute. Barden Tr. 7-10; MHL § 9.37.

[37] Plaintiff cites the testimony of Richard Miraglia for the proposition that psychiatrists dislike the constraints imposed by law on their clinical discretion to commit individuals requiring inpatient care, regardless of their dangerousness. Miraglia Tr. 142-43.

For example, Dr. Paul stated he certified M.T. because M.T. was taking drugs, stopped taking his medication, had a short temper and poor judgment, and hallucinated. Paul Tr. 141-2. Dr. Paul certified S.B. because he had delusions, thought disorder, and pressured speech. *Id*. at 155. He certified D.R. because he set a fire and lay down next to it. *Id*. at 86-87. Dr. Paul also testified that R.B. was a danger to himself because he was depressed, had an element of psychosis, was apparently stealing and begging, and had impaired judgment. *Id*. at 164-70. Lastly, Dr. Paul testified that R. Bu. was a danger to himself because he was depressed, disheveled with poor hygiene, seemed to have no community support, and was otherwise unable to meet his needs. *Id*. at 177-80. Drs. LaGuerre similarly explained his reasons for commitment. LaGuerre Tr. 42-48, 59-63, 144.[38]

The two committment certificates specifically pointed to by plaintiffs, those of Drs. De Los Santos and Singh, also reflect consideration of relevant risk assessment factors. Dr. De Los Santos committed M.B. because she was depressed, had been noncompliant with treatment, had violated an order of protection, and had delusional thinking. Brooks Dec. Ex. U. Dr. Singh's commitment certificate for E.S. details that E.S. was

---

[38] A portion of Dr. LaGuerre's deposition testimony indicates that he may have committed one individual although, at the time of commitment, he did not believe the individual would be a danger to himself or others. La Guerre Tr. 141-42. He later clarified, however, that there was the possibility of risk because of the individual's delusions. *Id*. at 144.

uncooperative, paranoid, grossly impaired, had a prior history of

psychiatric hospitalizations and noncompliance with treatment,

was disheveled upon arrest and incapable of being managed in the

community.  Brooks Ex. V.[39]

The only reason that plaintiffs offer to explain why OMH

psychiatrists would make up pretextual reasons to commit

individuals is the assertion that many physicians, when they

believe someone requires inpatient treatment, dislike the

constraints on clinical discretion imposed by the law.  Pls.'

Opp. 34.  Initially, I note that even if it were true that some

psychiatrists dislike legal constraints, such a conclusion says

nothing about the psychiatrists at Creedmoor and Hudson River.

Moreover, the connection between dislike and disobedience is too

tenuous to create a triable issue of fact when each and every

psychiatrist testified to their belief that the committed

individuals were dangerous and contemporaneously, as evidenced by

the commitment certificates, gave reasons that reflected

---

[39]  Moreover, a factfinder could not conclude from the commitment
certificates alone that the findings of dangerousness were pretextual.  There
is no dispute that the many documents available to psychiatrists at the time
of commitment must be considered.  Indeed, even Dr. Lubit, plaintiffs' expert,
admits that commitment certificates are simply required forms and do not need
to be as detailed as, or repeat information in, the initial assessment forms.
Lubit Tr. 287-89.
    Moreover, several courts have found short, general statements in
commitment forms legally sufficient.  *See, e.g, Drozdik v. City of New York*,
2003 WL 366639, at *4 (S.D.N.Y. Feb. 20, 2003) ("schizophrenic, psychotic,
paranoid [and] threatening" and "not able to take care of [him]self"); *DePoel
v. City of New York*, 772 F. Supp. 106, 107 (E.D.N.Y. 1991) ("Pt has been
disorganized, unkempt, grossly delusional, paranoid, unable to take care of
herself or house" and affirmative answer to question "Does the patient show a
tendency to injure himself").

evaluation of at least some of the risk factors plaintiffs agree are relevant. *See Olivier*, 398 F.3d at 191 (granting summary judgment because it was "entirely speculative to leap from [evidence that doctor told plaintiff and his sister that he could not commit plaintiff] to a conclusion that plaintiff was committed for reasons other than the defendant doctors' conclusion that [plaintiff] posed an imminent danger to himself or others").

At most, plaintiffs have demonstrated that they disagree with the psychiatrists' assessments or, as with the Eighth Cause of Action, an issue of fact that the assessments fell below accepted medical standards. But they have offered no evidence that the OMH psychiatrists committed individuals on pretext. Accordingly, defendant Commissioner's motion for summary judgment on the Seventh Cause of Action is granted.

C.  NINTH CAUSE OF ACTION

Plaintiffs withdraw their assertion that patients at Hudson River and Creedmoor have been subject to five to ten minute evaluations. Pls.' Opp. 5. Accordingly, summary judgment in favor of defendant Commissioner on this claim is granted.

D.  ELEVENTH CAUSE OF ACTION

Defendant argues that this cause of action should be dismissed under the law of the case. *Thomas v. City of New York*, 2007 WL 2156652, at *5 n.14 (E.D.N.Y. Jul. 26, 2007) ("[W]hen a

court decides upon a rule of law, that decision should continue
to govern the same issues in subsequent stages of the same case")
(citations omitted).  In *Monaco III*, I found the Eleventh Cause
of Action duplicative of the Eighth, as against defendant Sedler,
because plaintiffs acknowledged that in Eleventh Cause of Action,
they were contending not that New York's commitment statutes were
void for vagueness, but rather they were acceptable but being
applied in a manner that violates the Constitution.  *Monaco III*,
at *7-8.

Plaintiffs allege these same Eighth and Eleventh Causes of
Action against defendant Commissioner.  Plaintiffs do not dispute
that the Eleventh Cause of Action is duplicative of the Eighth or
make any attempt to argue that the Eleventh Cause of Action
should not be dismissed.  Accordingly, I grant summary judgment
in favor of defendant Commissioner on the Eleventh Cause of
Action.[40]

E. Conclusion

---

[40]  Defendant Commissioner argues that Causes of Action Seven through
Eleven do not apply to Hudson River because it is in Dutchess County and the
Civil Commitment Subclass, on whose behalf these claims are asserted, is
limited to individuals in the Eastern District of New York.  Assuming, without
deciding, that these Causes of Action do apply to Hudson River, summary
judgment is appropriate on the record before me for the reasons stated above.
Accordingly, plaintiff's request to amend the FAC to make the Seventh through
Eleventh Causes of Action applicable to Hudson River is futile, and is denied.
     Defendant Commissioner also argues that he cannot be enjoined to, among
other relief, train OMH psychiatrists and staff members in specified ways,
compel OMH psychiatrists and administrators to use a risk assessment form when
evaluating individuals for commitment, or require videotaping of all
involuntary commitment sessions because plaintiffs have not demonstrated
numerous, widespread constitutional violations.  Again, as I grant the
Commissioner's motion for the reasons set forth above, I need not discuss
these arguments or plaintiffs' counter-arguments.

For the reasons set forth above, defendant Commissioner's motion for summary judgment on plaintiffs' Seventh, Eighth, Ninth, and Eleventh Causes of Action is granted.

II. DEFENDANT CAHILL'S MOTION TO ABSTAIN AND DISMISS THE FIRST AND SECOND CAUSES OF ACTION

Federal courts may not entertain actions that seek to impose "an ongoing federal audit of state criminal proceedings." *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974) (declining to issue injunction against alleged racially discriminatory administration of criminal justice system in Illinois county because such injunction would lead to the precise federal interference in state judicial proceedings that *Younger v. Harris*, 401 U.S. 37 (1971), was designed to prevent). Under *Younger*, a federal court must abstain from exercising jurisdiction when plaintiff's federal constitutional claims could be raised in an ongoing state matter. The requirements of *Younger* are that there be an ongoing state court proceeding, entailing an important state interest, and that plaintiff have an opportunity to raise her constitutional claims during or after the state court proceeding. *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001).

The Second Circuit has also previously examined the role of federal courts with respect to litigation challenges concerning the internal workings of state courts. *See Wallace v. Kern*, 481 F.2d 621 (2d Cir. 1973) (*Wallace I*) (reversing injunction requiring clerk of state court to calendar all *pro se* motions

filed by members of plaintiff class), *cert. denied* 414 U.S. 1135
(1974); *Wallace v. Kern*, 499 F.2d 1345 (2d Cir. 1974) (*Wallace
II*) (reversing injunction requiring that inmates under indictment
be permitted to demand trial after six-month pretrial
incarceration (nine months in case of inmates accused of murder)
and be released on their own recognizance if not brought to trial
within 45 days of their demand), *cert. denied* 420 U.S. 947
(1975); *Wallace v. Kern*, 520 F.2d 400 (2d Cir. 1975) (*Wallace
III*) (reversing injunction requiring evidentiary hearings and a
written statement of reasons by state judges for fixing bail),
*cert. denied* 424 U.S. 912 (1976).  In so holding, the Second
Circuit wrote that "'under the principle known as comity a
federal district court has no power to intervene in the internal
procedures of the state courts.'" *Id*. at 405 (quoting *Wallace I*,
481 F.2d at 622).  The Circuit further observed that the federal
courts cannot "legislate and engraft new procedures upon existing
state criminal practices." *Id*. at 404.  Abstention in this case
is appropriate under *Younger* and the Second Circuit's *Wallace*
line of cases.[41]

There is no dispute that the second *Younger* prong is

---

[41] Plaintiffs seek only a declaration that maintaining a system that
requires incompetent defendants to remain in jail for up to thirty days while
awaiting a competency determination and failing to notify OMH of a potentially
incompetent individual violate the constitutional due process rights of the
Incompetency Subclass.  FAC pp. 50-51 (Requests for Relief a and b).  As such
declarations would require the state courts to change their methods of
operations, and therefore have the same practical effect as an injunction, the
above principles remain applicable.

satisfied. "[A] state's interest in the administration of criminal justice within its borders is an important one." *Hansel v. Town Court for Town of Springfield, N.Y.*, 56 F.3d 391, 393 (2d Cir. 1995) (dismissing, on *Younger* grounds, complaint alleging use of non-lawyer judges in town court violated criminal defendant's constitutional rights). Additionally, the third prong is satisfied as members of the Incompetency Subclass, upon behalf of whom the First and Second Causes of Action are asserted, may assert their claims via a state writ of habeas corpus. N.Y. Const. art. I, § 4; CPLR §§ 7001-7002; *see also Wallace III* at 407 (New York's habeas corpus statute satisfies the third prong of the *Younger* test).

Plaintiffs argue that abstention is inappropriate because the first requirement of *Younger* will not always be met. First, they note that many class members are not parties to state criminal proceedings where they can challenge the length of their confinement because they have not yet been charged with a crime. They further note that, at least with regards to the Second Cause of Action, abstention is inappropriate because the final order of observation terminates the state court proceeding.[42]

Such arguments ignore the holdings in the *Wallace* line of

---

[42] Plaintiffs also argue that abstention is not appropriate because the issues raised by the First and Second Causes of Action cannot be raised as a defense in the state court proceedings. Pls.' Opp. to Defendant Cahill's Mot. to Dismiss (hereinafter "Pls.' Cahill Opp. ") 10. The Second Circuit, however, has explicitly rejected such a requirement. *Bedrosian v. Mintz*, 518 F.2d 396, 399 (2d Cir. 1975).

cases.  Indeed, the Second Circuit has stated that "[t]he proposition that the principles underlying *Younger* are applicable only where the federal court is seeking to enjoin a pending state criminal prosecution is not supportable."  *Wallace III*, at 405. Moreover, the Second Circuit did not rely on *Younger* in either *Wallace I* or *Wallace II*.  Further, in *Wallace III*, the Second Circuit, although discussing *Younger*, noted its warning in *Wallace I* that "'under the principle known as comity a federal district court has no power to intervene in the internal procedures of the state courts.'" *Wallace III*, at 405. (quoting *Wallace I*, at 622).  Accordingly, assuming, without deciding, that certain of the *Younger* factors will not be satisfied as to all members of the Incompetency Subclass at all times, such will not be fatal to defendant Cahill's motion.

Plaintiffs' principle argument in opposition to dismissal is that defendants, by waiting several years to raise this issue, have waived their right to argue for abstention.[43]  The Supreme Court, however, has recognized waiver of the *Younger* abstention defense only when a state expressly urges a federal court to adjudicate the constitutional claims before it.  *Ohio Civil Rights Comm. v. Dayton Christian Schools*, 477 U.S. 619, 626

---

[43] Plaintiffs' arguments focus on *Younger* only, but I apply them to the *Wallace* line as well.

(1986).[44]  Indeed, in two cases, the Supreme Court has raised the
issue of abstention *sua sponte*, after issues on the merits had
been determined, although it ultimately decided the merits
because the state so urged.  *Sosna v. Iowa*, 419 U.S. 393, 396-97
n. 3 (1975); *Ohio Bureau of Empl. Servs. v. Hodory*, 431 U.S. 471,
479-80 (1977).

Contrary to plaintiff's contention, *In re Diary Mart
Convenience Stores v. Nickel*, 411 F.3d 367, 373 (2d Cir. 2005)
does not stand for the proposition that failure to timely raise
*Younger* (and *Wallace*) abstention results in a waiver.  Rather,
the Second Circuit deemed the abstention issue waived because the
state had never raised the issue at any level, including on
appeal.  *Id*.  Plaintiff also cites *Federation of Puerto Rican
Org. of Brownsville, Inc. v. Howw*, 157 B.R. 206, 211 (E.D.N.Y.
1993).  This case, however, concerned 28 U.S.C. § 1334(c)(2)'s
requirement that a motion to abstain in a bankruptcy proceeding
be timely filed, and not *Younger* (or *Wallace*) abstention.

Plaintiffs further attempt to analogize *Younger* (and
*Wallace*) abstention to lack of personal jurisdiction or
insufficient service issues.  However, "*Younger* is not a
jurisdictional bar based on Article III requirements, but instead

---

[44]  Plaintiffs cite to the dissent in a recent Sixth Circuit case which
states that "express repudiation" of the *Younger* defense is not the only
circumstance that warrants a finding of waiver.  *O'Neill v. Coughlan*, 511 F.3d
638, 644-45 (6th Cir. 2008).  The majority in *O'Neill*, however, found that the
*Younger* defense had not been waived although the state had addressed the
merits and a preliminary injunction had been issued.

a prudential limitation on the court's exercise of jurisdiction grounded in equitable considerations of comity." *Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 74 (2d Cir. 2003). Moreover, Federal Rule of Civil Procedure 12(b) requires any motion to dismiss based on lack of jurisdiction or insufficient service of process be made before a responsive pleading is filed, but there is no corresponding rule concerning abstention. Accordingly, the cases plaintiff cites concerning personal jurisdiction and insufficient service are inapposite.

Plaintiff additionally argues that declining jurisdiction over the First Cause of action is not appropriate because the claim raises an issue that relates directly to the Incompetency Subclass members' fundamental right to liberty. The Second Circuit has addressed and dismissed reliance on one of the cases plaintiff cites, *Gerstein v. Pugh*, 420 U.S. 103 (1975). Indeed, the Second Circuit held that because New York provided for habeas corpus, while Florida did not, *Pugh* was inapposite.[45] *Wallace*

---

[45] The language of *Pugh* upon which plaintiffs sought to rely on in *Wallace III* and this case comes from footnote 9 of the opinion, which states:

> The District Court correctly held that respondents' claim for relief was not barred by the equitable restrictions on federal intervention in state prosecutions, *Younger v. Harris*, 401 U.S. 37 (91 S.Ct. 746, 27 L.Ed.2d 669) (1971). The injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of trial on the merits. *See Conover v. Montemuro,* 477 F.2d 1073, 1082 (CA3 1973); *cf. Perez v. Ledesma*, 401 U.S. 82 (91 S.Ct. 674, 27 L.Ed.2d 701) (1971); *Stefanelli v. Minard*, 342 U.S. 117 (72 S.Ct. 118, 96 L.Ed. 138) (1951).

*III*, 520 F.2d at 406-07.  Similarly*, County of Riverside v. McLaughlin*, 500 U.S. 44, 47, 56 (1991) and *Williams v. Ward*, 845 F.3d 374, 381, 387 (2d Cir. 1988), *cert. denied*, 488 U.S. 1020 (1989), also cited by plaintiffs, dealt with the issue of how long an individual arrested without a warrant could be detained without a probable cause hearing.  Plaintiffs in this case do not challenge the legality of their arrests, simply the time it takes to calendar their competency hearings and the time it takes to notify OMH once an incompetency finding is made.

Plaintiffs finally argue that the Court should not abstain from adjudicating the Second Cause of Action because the relief does not challenge the manner in which state courts conduct their proceedings.  But requiring a state court to notify OMH of the possibility that an individual may be found incompetent prior to the issuance of a final order of observation and directing the method by which the state court must advise OMH of the issuance of a final order of observation (which plaintiff seeks leave to amend his complaint to allege) is exactly the sort of interference *Younger,* the *Wallace* cases, and *O'Shea* seek to avoid.[46]  *See Kaufman v. Kaye*, 466 F.3d at 87 ("we cannot resolve

_____

*Pugh*, 420 U.S. at 108, n.9.  The Second Circuit determined in *Wallace III* that this language, although facially supportive of plaintiff's position, could not be divorced from *Pugh's* factual context.

[46]  Plaintiffs seek leave to amend the FAC to seek this relief if the Court determines abstention is required on the Second Cause of Action as well. Pls.' Cahill Opp. 13.  For the reason set forth above, I deny this request as futile.

the issues raised here . . . without committing to resolving the same issues as to the remedy chosen by the state and as to the subsequent case-by-case implementation of the [remedy].  This is exactly what *O'Shea* forbids").[4748]

Accordingly, defendant Cahill's motion for abstention and dismissal of the First and Second Causes of Action is granted.

## Conclusion

For the reasons set forth above, defendant Commissioner's motion for summary judgment on plaintiffs' Seventh, Eighth, Ninth, and Eleventh Causes of Action as to Creedmoor and Hudson River is granted.  Defendant Cahill's motion to dismiss the First and Second Causes of Action is granted.

Having raised the issue of whether, pursuant to Fed. R. Civ. P. 54(b), I could certify a judgment granting such relief as a final judgment, and having received submissions from the parties,

---

[47] *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 119-1122 (9th Cir. 2003) is inapposite, as plaintiff in that case sought an injunction requiring state hospital to accept patients certified as incompetent.  *Bell v. Wolfish*, 441 U.S. 520 (1979), also cited by plaintiffs, concerned a federally operated facility.

[48] Although it is now unnecessary, I touch briefly upon defendant Cahill's motion to decertify the class of local criminal court judges. Defendant argues that, since plaintiffs no longer challenge the constitutionality of CPL § 740.30 or any other statute, plaintiffs altered claims deprive them of the basis for commonality and typicality, since they essentially challenge the practice of each local criminal court judge.  I, and plaintiffs, agree, *see* Pls.' Cahill Opp. 6, that, in the absence of abstention, the class would have to decertified, as it is now analogous to the class of local sheriffs I declined to certify in 1999.  *See Monaco I*, 187 F.R.D. at 67.  Plaintiff argues, however, that it should be permitted to amend the FAC to assert its claims against individual local criminal court justices, including New York's Chief Administrative Judge.  Such claims, however, are barred under *Younger* and the *Wallace* line of cases, for the reasons stated above, and the request is denied as futile.

I conclude I may not enter final judgment in favor of either defendant Cahill or defendant Commissioner. *See* Fed. R. Civ. P. 54(b). In determining whether to direct entry of a final judgment, courts are to consider "the relatedness of the pending and adjudicated claims, the factual bases for the claims and the effect a decision on the pending claims would have on questions raised on appeal." *Federal Deposit Ins. Corp. v. Bernstein*, 944 F.2d 101, 108-109 (2d Cir. 1991).

The First and Second Causes of Action, although fully determining the rights and liabilities of defendant Cahill, are not distinct and separable claims from others in the Complaint. For example, the Fourth Cause of Action alleges that defendant Commissioner violates the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983 because she does not designate a facility to which an incompetent defendant is to be transferred prior to the hearing on a defendant's capacity. Resolution of this claim will surely require reference to the procedures of criminal court judges, such as defendant Cahill, challenged in the Second Cause of Action. Further, defendant Tisch may raise an abstention defense in relation to the Sixth Cause of Action. Accordingly, the claims are not "separate and distinct."

Additionally, my decision on the Seventh, Eighth, Ninth and Eleventh Causes of Action does not eliminate defendant Commissioner as a party since the Commissioner is also named in

the Third, Fourth, and Fifth Causes of Action.    Further,
plaintiffs may continue to assert the Seventh, Eighth, Ninth and
Eleventh Causes of Action against defendant Commissioner as to
facilities other than Creedmoor and Hudson River.[49]

The Clerk is directed to transmit a copy of the within to
all parties and the assigned Magistrate Judge.

SO ORDERED.

Dated :    Brooklyn, New York
           August 26, 2008

                    By:  /s/ Charles P. Sifton (electronically signed)
                         United States District Judge

_____

[49]  Plaintiff argues that there is a basis for appeal of my decision
pursuant to 28 U.S.C. § 1292(b) on the Eighth Cause of Action because of my
determination that due process is not violated when generally accepted medical
standards are used and that the actions of OMH's physicians actions must shock
the conscience.
     The Second Circuit has repeatedly emphasized that a district court is to
"exercise great care in making a § 1292(b) certification."  *Primavera
Familienstifung v. Askin*, 139 F. Supp.2d 567, 570 (S.D.N.Y. 2001) (quoting
*Westwood Pharmaceuticals, Inc. v. National Fuel Gas Dist. Corp.*, 964 F.2d 85,
89 (2d Cir. 1992)); *see also Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21,
25 (2d Cir. 1990).  "Certification is only warranted in 'exceptional cases,'
where early appellate review 'might avoid protracted and expensive
litigation.'" *Primavera*, 139 F. Supp.2d at 570 (quoting *Telectronics
Proprietary, Ltd. v. Medtronic, Inc.*, 690 F. Supp. 170, 172 (S.D.N.Y.1987)).
"Section 1292(b) was not intended to open the floodgates to a vast number of
appeals from interlocutory orders in ordinary litigation or to be a vehicle to
provide early review of difficult rulings in hard cases."  *Id.* (citations and
internal quotation marks omitted).
     "In determining whether a controlling question of law exists the
district court should consider whether: reversal of the district court's
opinion could result in dismissal of the action; reversal of the district
court's opinion, even though not resulting in dismissal, could significantly
affect the conduct of the action; or, the certified issue has precedential
value for a large number of cases." *Id.* at (citing *Klinghoffer*, 921 F.2d at
24-25).
     Reversal of these the decisions plaintiff cites would not result in
dismissal of the action or have precedential value for a large number of
cases.  Additionally, it affects only one of nineteen causes of action.
Accordingly, certification is denied.